**Slip Op. 05-106**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

HYNIX SEMICONDUCTOR INC.,
HYNIX SEMICONDUCTOR AMERICA INC.,

                    Plaintiffs,

                    v.

UNITED STATES,

                    Defendant,

                    and

INFINEON TECHNOLOGIES, NORTH
AMERICA CORP. and MICRON
TECHNOLOGY, INC.,

                    Defendant-
                    Intervenors.

Before: Richard W. Goldberg,
        Senior Judge

Court No. 03-00651

<u>OPINION</u>

[Commerce's final affirmative countervailing duty determination remanded for further consideration and explanation of financial contribution analysis.]

Dated: August 26, 2005

<u>Willkie, Farr & Gallagher, LLP</u> (<u>Daniel Lewis Porter</u> and <u>James Philip Durling</u>) for Plaintiffs Hynix Semiconductor Inc. and Hynix Semiconductor America Inc.

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director; <u>Jeanne Davidson</u>, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (<u>David F. D'Alessandris</u>) for Defendant United States.

<u>King & Spalding, LLP</u> (<u>Gilbert Bruce Kaplan</u> and <u>Cris R. Revaz</u>) for Defendant-Intervenor Micron Technology, Inc.

<u>Collier, Shannon, Scott, PLLC</u> (<u>Kathleen W. Cannon</u>) for Defendant-Intervenor Infineon Technologies North America Corp.

Goldberg, Senior Judge:  In this action, Plaintiffs Hynix Semiconductor Inc. and Hynix Semiconductor America Inc. (together, **"Hynix"**) challenge the final affirmative determination of the United States Department of Commerce (**"Commerce"**) in the countervailing duty proceedings involving dynamic random access memory semiconductors (**"DRAMS"**) from the Republic of Korea (**"Korea"**).  See Dynamic Random Access Memory Semiconductors from the Republic of Korea, 68 Fed. Reg. 37122 (Dep't Commerce June 23, 2003) (final determination), as amended by 68 Fed. Reg. 44290 (Dep't Commerce July 28, 2003) (amended final determination) (together, the **"Final Determination"**); see also Dynamic Random Access Memory Semiconductors from the Republic of Korea, 68 Fed. Reg. 47546 (Dep't Commerce Aug. 11, 2003) (notice of countervailing duty order).[1]  Pursuant to USCIT Rule 56.2, Hynix moves for judgment on the agency record.  The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

---

[1] The Final Determination was also challenged by the Korean government before the World Trade Organization (the **"WTO"**).  See WTO Dispute Settlement Proceeding Regarding Countervailing Duty Investigation on Dynamic Random Access Memory Semiconductors (DRAMS) from Korea, 69 Fed. Reg. 34413 (USTR June 21, 2004) (notice and request for comment) (providing notice of Korean government request to establish WTO dispute settlement panel concerning DRAMS countervailing duty investigation).  The result of these WTO proceedings has no bearing on the Court's review of Commerce's regulations and practices at issue in this case.  See 19 U.S.C. § 3533(g) (1999) (describing statutory scheme which must be observed in order to change otherwise valid agency policy to conform to WTO ruling).

## I.  BACKGROUND

### A.   Precipitating Events

Hynix is a Korean DRAMS producer with a history of poor financial performance dating from the late 1990s.  See Appendix to Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Administrative Record (**"Def.'s App."**), App. 4 (Memorandum from Deputy Assistant Secretary to Assistant Secretary dated March 31, 2003) at 3-5 (analyzing Hynix's financial records from 1997 to 2002).  In response to its deteriorating performance, Hynix underwent financial restructuring from approximately December 2000 to October 2001.  Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment on the Agency Record (**"Def.'s Br."**) at 8-9.  During this ten-month period, four events formed the major part of the restructuring: (1) execution of a ten-bank syndicated loan to Hynix (December 2000); (2) enrollment of Hynix in the Korean government's 'Fast Track' program which allowed repackaging and refinancing of rapidly maturing bonds (January 2001); (3) execution of a seventeen-bank debt restructuring package in favor of Hynix contingent on a successful international equity offering by Hynix (May 2001); and (4) execution of a seventeen-bank debt and debt-to-equity restructuring package in favor of Hynix (October 2001).  Id. at 8-12; Plaintiffs' Memorandum In Support of Its Rule 56.2 Motion for Judgment on the Agency

Record (**"Pls.' Br."**) at 11-13. These events necessarily involved the participation of Hynix's multiple creditors, which formed a creditors council including at least seventeen specialized government entities, majority government-owned financial institutions, and private financial institutions. Def.'s Br. at 10; Pls.' Br. at 11-13. Among these creditors was Citibank, a non-Korean financial institution. Def.'s Br. at 12. Together with its affiliate Solomon Smith Barney (**"SSB"**), Citibank also served as a paid financial adviser to Hynix during its restructuring. Id. at 6.

**B.   Commerce's Investigation**

On November 1, 2002, Defendant-Intervenor Micron Technology, Inc. (**"Micron"**), a domestic DRAMS producer, filed a petition with Commerce and the United States International Trade Commission (the **"ITC"**) alleging that Hynix[2] had received financial assistance from the Korean government during its restructuring which had resulted in an adverse impact on the

---

[2] Because the petition generally alleged that Korean manufacturers, producers, or exporters of DRAMS were receiving countervailable subsidies, Commerce's investigation also included Samsung Electronics Industries Co., Ltd. (**"Samsung"**), another major Korean DRAMS producer/exporter. Ultimately finding that Samsung received de minimis subsidies, Commerce made a negative countervailing duty determination as to Samsung. Final Determination at 37124. Commerce's conclusions related to Samsung are not at issue in this case and Samsung is therefore not discussed.

DRAMS industry in the United States (the **"U.S."**).  Def.'s Br. at 3.  Commerce initiated a countervailing duty investigation shortly thereafter.  Random Access Memory Semiconductors from the Republic of Korea, 67 Fed. Reg. 70927 (Dep't Commerce Nov. 27, 2002) (initiation of countervailing duty investigation).  In connection with the preliminary phase of the investigation, Commerce issued questionnaires to the Korean government and Hynix and received responses and comments.  Def.'s Br. at 3-4.  On April 7, 2003, Commerce issued an affirmative preliminary countervailing duty determination.  Dynamic Random Access Memory Semiconductors from the Republic of Korea, 68 Fed. Reg. 16766 (Dep't Commerce Apr. 7, 2003) (preliminary determination).

Commerce then commenced its final countervailing duty investigation, which included additional questionnaires and a two-week visit to Korea to conduct on-site verification of questionnaire responses.  Def.'s Br. at 4.  While in Korea, Commerce met with Hynix employees, Korean government officials, several of Hynix's creditors, and a number of unnamed Korean financial experts.  Pls.' Br. at 2-3.  Following verification, Commerce received case and rebuttal briefs from all parties and held a hearing on June 6, 2003.  Def.'s Br. at 4-5.

C.   Commerce's **Final Determination**

As a result of its investigation, on June 23, 2003, Commerce issued the Final Determination and a supplemental

decision memorandum incorporated therein.  See Issues and Decision Memorandum for the Final Determination in the Countervailing Duty Investigation of Dynamic Random Access Memory Semiconductors from the Republic of Korea, Inv. No. C-580-851, (Dep't Commerce June 16, 2003), available at http://ia.ita.doc.gov/frn/summary/korea-south/03-15793-1.pdf (**"Decision Memo"**).  In its Final Determination, Commerce concluded that Hynix had been the recipient of substantial indirect subsidies during its ten-month restructuring, which Commerce viewed to be a clandestine subsidy program orchestrated by the Korean government.  Decision Memo at 20-21.  According to Commerce, these subsidies came about when the Korean government caused or coerced financial institutions to participate in Hynix's restructuring by making preferential loans and debt-to-equity swaps.  Id.

To reach this conclusion, Commerce invoked its authority to countervail benefit-conferring financial contributions made by private parties pursuant to government direction, as described in 19 U.S.C. § 1677(5)(B)(iii).[3]  Id. at 21.  Commerce

_____

[3] This statute provides, in pertinent part:
    A subsidy is described in this paragraph in the case
    in which an authority . . .
        (iii) makes a payment to a funding mechanism to
        provide a financial contribution, or entrusts or
        directs a private entity to make a financial

(footnote continued)

interpreted this statute to mean that, "if a government affirmatively causes or gives responsibility to a private entity or group of private entities to carry out what might otherwise be a governmental subsidy function[,]" a financial contribution would exist which, if benefit-conferring, would constitute a countervailable subsidy.  Id. at 47.

To determine if Hynix's restructuring involved financial contributions of the type described in 19 U.S.C. § 1677(5)(B)(iii), Commerce employed a two-part methodology: (1) Commerce examined "whether the [Korean government] had in place during the relevant period a governmental policy to support Hynix" and (2) Commerce considered "whether evidence on the record establishe[d] a pattern of practices on the part of the [Korean government] to act upon that policy to entrust or direct lending decisions" as part of Hynix's restructuring.  Id. at 49 (emphasis added).  On the basis of the evidence derived from this methodology, Commerce found that substantial evidence supported the conclusion that, with the exception of Citibank, Hynix's creditors were subject to a program of government

_____

contribution, if providing the contribution would normally be vested in the government and the practice does not differ in substance from practices normally followed by governments, to a person and a benefit is thereby conferred. 19 U.S.C. § 1677(5)(B) (1999) (emphasis added).

direction during Hynix's restructuring and, as a result of this direction, had made financial contributions to Hynix. Id. at 49. Emphasizing a ten-month subsidy "program" theory, Commerce found that "the [Korean government's] role was essential at each stage in directly supporting the restructuring process through its own actions and by directing, facilitating, and guiding the actions taken by creditor banks." Id. at 49. Accordingly, Commerce concluded that the Korean government had entrusted or directed Hynix's creditors to provide Hynix with loans and debt-to-equity swaps which constituted potentially countervailable financial contributions. Id. at 62. Further, Commerce concluded that by providing these financial contributions, Hynix's creditors had effectively performed a "governmental subsidy function[.]" Id. at 47.

Commerce next considered whether these financial contributions had conferred a benefit to Hynix, thus rendering them countervailable under 19 U.S.C. § 1677(5)(B)(iii). Id. at 6-11, 90-92. To make this determination, Commerce attempted to compare the financial contributions under investigation to commercial benchmarks, i.e., similar loans or equity infusions made by independent actors to Hynix under market conditions. Id. However, Commerce determined that no commercial benchmarks were available, eliminating from consideration loans and equity infusions made by the independent Citibank because of its

involvement in Hynix's restructuring and the financial contributions under investigation.  Id.  Accordingly, Commerce analyzed Hynix to determine if the company was otherwise creditworthy or equityworthy during its restructuring, despite the lack of commercial benchmarks to this effect.  Id. at 11, 91-92.  Commerce determined that Hynix was neither.  Id.  As a result, Commerce concluded that Hynix would not have been able to attract loans or equity investment from reasonable commercial sources during its restructuring and, therefore, the financial contributions which Hynix received from its government-directed creditors conferred a countervailable benefit.  Id.

## II.  STANDARD OF REVIEW

The Court must sustain the Final Determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i) (1999).

Concerning the substantial evidence requirement, the U.S. Supreme Court has defined this term to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" taking into account the record as a whole. Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  It "requires more than a mere scintilla" but is satisfied by "something less than the weight of the evidence. . . ."  Luoyang Bearing Factory

v. United States, 27 CIT ___, ___, 288 F. Supp. 2d 1369, 1370 (2003) (citations omitted).  In conducting its review, it is insufficient for the Court to find "that the evidence supporting [Commerce's] decision is substantial when considered by itself. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 17 CIT 146, 149, 818 F. Supp. 348, 353 (1993) (citation omitted).  However, the Court "may not reweigh the evidence or substitute its own judgment for that of [Commerce]."  Acciai Speciali Terni S.p.A. v. United States, 28 CIT ___, ___ n.14, 350 F. Supp. 2d 1254, 1267 n.14 (2004) (citation omitted).  Instead, the Court's function is to ascertain "whether there is evidence which could reasonably lead to [Commerce]'s conclusion."  PPG Indus. v. United States, 978 F.2d 1232, 1237 (Fed. Cir. 1992) (citations omitted).  "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Id. (citations omitted).

     Concerning the accordance with law requirement, the Court applies two-part Chevron analysis to its review of Commerce's statutory interpretations in the context of a countervailing duty determination.  Allegheny Ludlum Corp. v. United States, 367 F.3d 1339, 1343 (Fed. Cir. 2004) (citing Chevron, U.S.A.,

Inc. v. NRDC, 467 U.S. 837 (1984)).  First, the Court determines "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the [C]ourt, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842.  "If the statute is silent or ambiguous with respect to the specific issue," however, the Court second considers "whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.  If so, the Court must defer to the agency's reasonable statutory interpretation.  Id. at 844.

Further, "[t]he deference granted to the agency's interpretation of the statutes it administers extends to the methodology it applies to fulfill its statutory mandate."  GMN Georg Muller Nurnberg AG v. United States, 15 CIT 174, 178, 763 F. Supp. 607, 611 (1991) (citing Chevron, 467 U.S. at 844-45; Amer. Lamb Co. v. United States, 785 F.2d 994, 1001 (Fed. Cir. 1986); Melamine Chems., Inc. v. United States, 732 F.2d 924, 928 (Fed. Cir. 1984); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137 (Fed. Cir. 1987)).

### III.  DISCUSSION

**A.    Summary of Analysis**

This case involves an alleged program of indirect subsidies of the type described in 19 U.S.C. § 1677(5)(B)(iii).  That section of the countervailing duty statute[4] sets forth a three-prong test to prove the existence of a countervailable subsidy: Commerce must prove 1) the making of a <u>financial contribution</u> by a private entity to another private entity pursuant to government entrustment or direction, 2) the exercise of a <u>government subsidy function</u> in the provision of that financial contribution, and 3) the existence of a <u>benefit</u> from that financial contribution to its recipient.  The proper interpretation and application of the 'entrusts or directs' language of 19 U.S.C. § 1677(5)(B)(iii) – which establishes the existence of a financial contribution[5] - is the central issue in this case and a matter of first impression for the Court.

---

[4] References to the countervailing duty statute are to the Tariff Act of 1930, as amended by, <u>inter alia</u>, the Uruguay Round Agreements Act, 19 U.S.C. §§ 1671 <u>et seq.</u>

[5] It is uncontested that, if proven to be entrusted or directed by the Korean government, the loans and debt-to-equity swaps made by Hynix's creditors would constitute financial contributions for purposes of 19 U.S.C. § 1677(5)(B)(iii).  <u>See</u> 19 U.S.C. § 1677(5)(D) (1999) (defining "financial contribution" to include "the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees").

For the reasons that follow, the Court concludes that Commerce's interpretation of the 'entrusts or directs' language in this case is in accordance with law.  Congressional intent, Commerce's past practice, and this Court's jurisprudence clearly support Commerce's decision to interpret the 'entrusts or directs' language broadly so as to include a single program of financial contributions involving multiple financial institutions directed by a foreign government.  Under 19 U.S.C. § 1677(5)(B)(iii), Commerce may lawfully analyze countervailable financial contributions on a program basis rather than engage in a micro-analysis of each transaction making up the alleged program.  Further, Commerce's chosen methodology for proving such a program is sound.  While a finding by Commerce of a program of entrusted or directed financial contributions must be supported by substantial evidence, 19 U.S.C. § 1677(5)(B)(iii) does not require Commerce to produce conclusive evidence of entrustment or direction of each entity involved in each transaction making up an alleged program.  Rather, Commerce may lawfully support a finding of entrustment or direction with direct and circumstantial evidence drawn from across the alleged program (but not necessarily including conclusive evidence for each party or each transaction in the alleged program), so long as the cumulated evidence and the reasonable inferences drawn therefrom sufficiently connect all the implicated parties and

transactions to the alleged program of government entrustment or direction.

Nonetheless, the Court is compelled to remand the Final Determination because of errors in Commerce's application of its methodology in this case.  While Commerce may allege a program of government entrustment or direction under 19 U.S.C. § 1677(5)(B)(iii), Commerce must consider counterevidence indicating that the transactions making up that alleged program were formulated by an independent commercial actor (not a government) and motivated by commercial considerations.  Here, Commerce neglected to explain the influential role of Citibank/SSB and the aberrational presence of commercial contingencies in Hynix's restructuring as part of its financial contribution analysis.  These serious errors require remand of the portion of the Final Determination concerning Commerce's financial contribution analysis for further consideration and explanation before the Court may undertake its substantial evidence review.  Because the Court is remanding on the threshold issue of the existence of potentially countervailable financial contributions, the Court does not yet reach the parties' arguments concerning other aspects of the Final Determination (i.e., Commerce's governmental subsidy function analysis and benefit analysis).  The Court's conclusions are discussed more fully below.

**B.    Commerce's Statutory Interpretation and Methodology Are In Accordance with Law**

As an initial matter, Hynix generally objects to Commerce's decision to frame the parties and transactions at issue in this case as participating in a single "program" of entrustment or direction.  Pls.' Br. at 16.  Hynix contends that this generalized program theory and associated evidentiary approach obscure the more specific inquiry required by the 'entrusts or directs' language of 19 U.S.C. § 1677(5)(B)(iii) and is contrary to law.  Id. at 15-17; Plaintiffs' Reply to Defendant's and Defendant-Intervenor's Memorandum In Opposition to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record (**"Pls.' Reply"**) at 1-5, 7.

The Court understands Hynix's objection to include two separate arguments: (1) an appropriate interpretation of the statutory language does not permit Commerce to pursue a program theory of entrusted or directed financial contributions and (2) regardless of whether a program theory is permissible, Commerce's methodology must include an analysis of each investigated party and transaction separately and produce evidence of entrustment or direction on that basis.  For the reasons that follow, the Court rejects Hynix's arguments and upholds both Commerce's statutory interpretation and methodology.

**1.  *Commerce's Statutory Interpretation of the 'Entrusts or Directs' Language To Include a Single Program of Government-Directed Financial Contributions Involving Multiple Financial Institutions and Multiple Transactions Is In Accordance with Law***

Hynix argues that Commerce erred by framing each transaction made by each financial institution at issue as a single government-directed program of financial contributions. Pls.' Br. at 16.  Instead, Hynix contends that 19 U.S.C. § 1677(5)(B)(iii) establishes a standard whereby Commerce must separately analyze each alleged financial contribution.  Id.

The Court finds that, under Chevron analysis, Commerce's decision to interpret the 'entrusts or directs' language to include a multi-stage, multi-actor program of financial contributions is reasonable.  As an initial matter, the Court notes that the countervailing duty statute does not define 'entrusts or directs' or provide examples of practices, transactions, or events that would constitute an entrusted or directed financial contribution.  Turning to the relevant legislative history, Congress expressly acknowledged that this phrase would be subject to interpretation.  The Uruguay Round Agreements Act Statement of Administrative Action (the **"SAA"**)[6] states:

---

[6] Congress has mandated that the SAA "shall be regarded as an authoritative expression by the United States concerning the

(footnote continued)

>     [T]he term 'financial contribution' includes
>     situations where the government entrusts or directs a
>     private body to provide the subsidy. (It is the
>     Administration's view that the term 'private body' is
>     not necessarily limited to a single entity, but can
>     include a group of entities or persons.) . . . . [T]he
>     Administration intends that the 'entrusts or directs'
>     standard shall be interpreted broadly.  The
>     Administration plans to continue its policy of not
>     permitting the indirect provision of a subsidy to
>     become a loophole when unfairly traded imports enter
>     the United States and injure a U.S. industry . . . .
>
>          . . . .
>
>     In cases where the government acts through a
>     private party . . . the Administration intends that
>     the law continue to be administered on a case-by-case
>     basis . . . .

SAA, H.R. Doc. No. 103-465, at 925-26 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4239-40, 1994 WL 761793.  In light of the SAA, the Court finds that the 'entrusts or directs' language presents precisely the type of ambiguity which an administrative agency, like Commerce, is given deference under Chevron step one to reasonably interpret.  See Floral Trade Council v. United States, 23 CIT 20, 24, 41 F. Supp. 2d 319, 324 (1999) (noting that Court will defer to Commerce's reasonable interpretation under Chevron where Congress's intended definition of a term is not ascertainable through statutory construction).

---

interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements Act] in any judicial proceeding in which a question arises concerning such interpretation or application."  19 U.S.C. § 3512(d) (1999).

Proceeding to Chevron step two, the Court first notes that,
in conformity with the SAA, Commerce has committed itself to
interpreting the 'entrusts or directs' language on a case-by-
case basis.  Commerce eschewed the opportunity to articulate a
fixed definition of this phrase when it promulgated its
countervailing duty regulations after the passage of the Uruguay
Round Agreements Act.  See Countervailing Duties, 63 Fed. Reg.
65348, 65349 (Dep't Commerce Nov. 25, 1998) (final rule)
(explaining that the phrase "could encompass a broad range of
meanings" and indicating that it would not be "appropriate to
develop a precise definition of the phrase for purposes of these
regulations").  When interpreting the phrase in this case,
Commerce alleged that entrusted or directed financial
contributions could manifest as a series of loans and equity
infusions made by multiple financial institutions pursuant to a
single government program of direction.  In its Decision Memo,
Commerce explained why it considered this programmatic
formulation to be more appropriate than analyzing each
constituent element of the alleged program:

> It is clear from the [statutory language] defining
> "subsidy" that a subsidy is a program by a government
> or directed by a government.  There is no sense in the
> statute that individual events of a subsidy program
> need to be evaluated outside of the overall context of
> the subsidy program.  Rather, a subsidy program can
> include multiple elements and multiple actors, brought
> together for an overarching governmental objective.

Decision Memo at 48 n.11.[7]

The question for the Court is whether this interpretation of the statute is based upon a "permissible" construction. Chevron, 467 U.S. at 843.  The Court concludes that it is. Through the SAA, Congress has directed Commerce to interpret the countervailing duty statute broadly so as to close any loopholes which might enable governments to provide indirect subsidies. As noted by Congress, the specific manner in which governments have acted through private entities to provide subsidies has varied widely in the past.  SAA, H.R. Doc. No. 103-465, at 926, 1994 U.S.C.C.A.N. at 4239.  This creativity can be expected to continue.  It is possible that governments increasingly sophisticated in countervailing duty law may choose to obscure their actions by pursuing complex, multi-stage subsidy programs.

_____

[7] Further, Commerce's use of a programmatic approach is consistent with its administration of other aspects of the countervailing duty statute.  For example, in Live Swine from Canada, Commerce explained that:

> Neither the countervailing duty statute nor regulations mandate a specific standard to be used when determining whether a program under review should be treated as a single program or several programs. Under these circumstances, the Department has discretion and must base its determination on a reasonable interpretation of the facts on the record.

Live Swine from Canada, 61 Fed. Reg. 52408, 52412 (Dep't Commerce Oct. 7, 1996) (final results of administrative review). See also Structural Steel Beams From the Republic of Korea, 65 Fed. Reg. 41051 (Dep't Commerce July 3, 2000) (final determination) (assessing different types of loans together).

If so, such programs may very well be best analyzed as a whole, rather than reviewed on a constituent basis.  Cf. United States v. Patten, 226 U.S. 525, 544 (1913) (noting that "the character and effect of a conspiracy is not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole") (citations omitted).  Loopholes would be opened – and the countervailing duty statute narrowed – if the 'entrusts or directs' language were read to require Commerce to separately analyze each element of an alleged program like the one at issue.  Where (as here) the same company, the same financial institutions, and the same governmental authorities are all allegedly involved in the pursuit of the same general goal over a period as short as ten months, it is reasonable for Commerce to view individual transactions by these entities as one large program and attempt to build a countervailing duty case on that basis.  Adopting the restrictive interpretation advocated by Hynix would flaunt Congress' desire for a broad interpretation and significantly limit Commerce's valuable case-by-case discretion.

In addition, Commerce's interpretation conforms with its past practice in the context of indirect subsidies, as this term was used in an earlier version of the countervailing duty

statute.[8]  In AK Steel v. United States, 192 F.3d 1367 (Fed. Cir.

1999), aff'g in part, rev'g in part British Steel P.L.C. v.

United States, 20 CIT 1141, 941 F. Supp. 119 (1996), the U.S.

Court of Appeals for the Federal Circuit (the **"Federal Circuit"**)

reviewed this Court's consideration of an alleged indirect

subsidy program by the Korean government to provide its domestic

steel industry with preferential access to medium- and long-term

credit from government and commercial financial institutions.

AK Steel, 192 F.3d at 1369.  In the determination at issue in AK

Steel, Commerce found that the Korean government's control of

lending institutions constituted a program which resulted in

preferential access to loans by the Korean steel industry and

the receipt of countervailable benefits.  Id. at 1372-73.

Neither this Court, nor the Federal Circuit on appeal, required

Commerce to compartmentalize or separately consider each loan

---

[8] Although the Uruguay Round Agreements Act first introduced the 'entrusts or directs' language into the countervailing duty statute, the concept of indirect subsidies is not new.  See 19 U.S.C. § 1671(a) (1988) (authorizing imposition of duty where "a country . . . is providing, directly or indirectly, a subsidy") (emphasis added).  According to the SAA, "[i]t is the Administration's view that [the 'entrusts or directs' language] encompass[es] indirect subsidy practices like those which Commerce has countervailed in the past, and that these types of indirect subsidies will continue to be countervailable . . . ." SAA, H.R. Doc. No. 103-465, at 926, 1994 U.S.C.C.A.N. at 4239-40 (citing, inter alia, Certain Softwood Lumber Products from Canada, 57 Fed. Reg. 22570 (Dep't Commerce May 28, 1992) (final determination); Leather from Argentina, 55 Fed. Reg. 40212 (Oct. 2, 1990) (final determination and duty order).

provided by each financial institution to each steel producer

within the alleged program.  Instead, as here, both courts

implicitly accepted Commerce's indirect subsidy program theory

and reviewed Commerce's determination on that basis.  E.g., id.

at 1374-75.

     Accordingly, the Court upholds Commerce's reasonable

interpretation of the 'entrusts or directs' language of 19

U.S.C. § 1677(5)(B)(iii).  See Serampore Indus. Pvt., Ltd. v.

U.S. Dep't of Commerce, Int'l Trade Admin., 11 CIT 866, 873, 675

F. Supp. 1354, 1360 (1987) (upholding Commerce's interpretation

of term used in countervailing duty statute where supported by

legislative history and sufficiently reasonable).

**2.    *Commerce's Methodology for Proving the Existence of a
       Program of Government-Entrusted or Directed Financial
       Contributions Is In Accordance with Law***

     Even if Commerce is statutorily permitted to allege

entrustment or direction on a program basis, Hynix notes that

Commerce must utilize a permissible methodology to prove the

existence of such a program.  Pls.' Br. at 7.  Hynix argues that

Commerce employed a faulty, "results-oriented" methodology to

prove the alleged program of entrusted or directed financial

contributions in this case.  Id.  Hynix objects to Commerce's

decision to prove the existence of the alleged program by

presenting 'government policy' and 'pattern of practices'

evidence drawn from across the alleged program but not including

specific evidence of entrustment or direction of each party or each transaction in the alleged program.  Id. at 6.  Where an alleged program involves multiple private entities and transactions, Hynix contends that Commerce must provide "a showing of actual and specific entrustment or direction" of each private entity for each transaction.  Id. at 16.  Without this detailed "bank-by-bank" or "event-by-event" inquiry, Hynix contends that Commerce's more generalized 'government policy' and 'pattern of practices' methodology enabled Commerce to "blur the details and to bootstrap its alleged evidence across the lengthy period investigated, and across the numerous banks considered."[9]  Id. at 15.

The Court concludes that Commerce's methodology for proving the alleged government-directed program of financial contributions involving multiple financial institutions and multiple transactions was reasonable.  Central to the Court's holding is its understanding of Commerce's methodology in light

---

[9] The Court recognizes that Hynix's arguments concerning Commerce's methodology are nearly identical to its arguments concerning Commerce's statutory interpretation.  The Court has chosen to address them separately to make clear Commerce's authority under the countervailing duty statute and Commerce's evidentiary obligations with regard to its chosen methodology. Further, although equal deference is owed to Commerce's statutory interpretation and choice of implementing methodology, see Chevron, 467 U.S. at 844-45, the Court's review of these agency actions requires two distinct inquiries.

of the evidentiary challenges posed by 19 U.S.C. § 1677(5)(B)(iii). This statute empowers Commerce to countervail benefit-conferring financial contributions made by private parties pursuant to government entrustment or direction – financial contributions which, by their furtive nature, are likely to be difficult to discern and even harder to prove by the requisite substantial evidence. Such evidence may be direct or circumstantial; indeed, given the nature of these financial contributions, it is probable that Commerce will rely heavily on circumstantial evidence to meet the substantial evidence standard in many cases. In appropriate circumstances, Commerce may permissibly use circumstantial evidence to prove, in whole or in part, the existence of entrusted or directed financial contributions under 19 U.S.C. § 1677(5)(B)(iii). See AK Steel, 192 F.3d at 1373-76 (discussing use of circumstantial evidence in indirect subsidy context); cf. Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330 (1960) (finding that, for purposes of establishing jury question, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence") (citation and footnote omitted).

Of course, Commerce must fairly weigh each piece of circumstantial evidence it invokes in support of a finding of government entrustment or direction. See Fuji Photo Film Co. v.

Jazz Photo Corp., 394 F.3d 1368, 1374 (Fed. Cir. 2005) (noting that, in trial context, fact finder "has the responsibility to weigh the [circumstantial] evidence . . . in deciding the inferential reach of such circumstantial evidence") (citation omitted). Circumstantial evidence is subject to inference, but not every piece of circumstantial evidence will support an inference of government entrustment or direction. However, when viewed together, several such inferences, drawn from multiple sources of corroborating evidence, could support a finding of entrustment or direction. Cf. Akron Polymer Container Corp. v. Exxel Container, 148 F.3d 1380, 1384 (Fed. Cir. 1998) (noting that, in patent context, an offense involving deception is "in the main proven by inferences drawn from facts, with the collection of inferences permitting a confident judgment that deceit has occurred"). This is particularly true when direct evidence further supports these inferences.

This reasoning applies with equal force to proving a single entrusted or directed financial contribution or an entire program of such financial contributions. Cf. Theatre Enter., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 541-42 (1954) (finding that, in antitrust context, conspiracy may be inferred from evidence of parallel behavior when combined with inferences from other facts and circumstances). Under certain circumstances, record evidence and the inferences drawn

therefrom could very well indicate that a foreign government is pursuing an elaborate program of subsidization, rather than a one-off subsidy. Commerce need not support such a conclusion with conclusive evidence incriminating every aspect of the alleged program, for a reasonable person could be satisfied as to the existence of the program with a lesser but highly persuasive evidentiary showing. See Consol. Edison, 305 U.S. at 229 (finding that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). This lesser evidentiary showing would likely rely on inferential connections between the various parties and transactions comprising the alleged program. So long as these inferences were reasonable, even Commerce's lesser evidentiary showing could permit a confident judgment that a clandestine program of entrusted or directed financial contributions had been carried out.

Commerce's methodology appears to be grounded in this sound reasoning. While the evidentiary support for Commerce's determination consisted of some direct evidence, the vast majority of evidence was circumstantial. Commerce chose to present this evidence in two parts. First, Commerce sought to prove that the Korean government had a 'governmental policy' to subsidize Hynix by introducing evidence indicating that the Korean government had a motive to subsidize. Second, Commerce

attempted to identify a 'pattern of practices' showing that the

Korean government acted on this motive as part of a program to

manipulate private entities.[10]  The practices identified by

Commerce varied but it appears to the Court that they may

broadly be categorized as including evidence of: (1) the Korean

government's propensity to subsidize companies like Hynix; (2)

the Korean government's proclivity for influencing or coercing

the actions of financial institutions to achieve its policy

goals; (3) the Korean government's opportunity or capacity to

specifically influence or coerce the financial institutions

involved in Hynix's restructuring; and (4) direct commands by

the Korean government to some of these institutions.  With the

exception of this last category (which relies on direct

evidence), proof of motive, propensity, proclivity, opportunity,

and capacity is derived by inference from circumstantial

evidence.  Individually, each of these inferences would be

insufficient to establish the existence of a program of

---

[10] This 'pattern of practices' inquiry appears to be similar to
the "causal nexus" between government action and benefits
allegedly bestowed by private entities which Commerce was
required to establish in order to prove an indirect subsidy
under the previous version of the countervailing duty statute.
See AK Steel, 192 F.3d at 1376.

entrustment or direction;[11] but, together, this collection of inferences could permit such a conclusion under 19 U.S.C. § 1677(5)(B)(iii), particularly when buttressed by corroborating direct evidence.  As such, the Court finds Commerce's methodology to be reasonable.

This conclusion by the Court is once again supported by the Federal Circuit's reasoning in AK Steel.  As here, the AK Steel court did not require Commerce to provide, as a matter of law, conclusive evidence implicating each party and each step in the alleged program of indirect subsidies.  Rather, the Federal Circuit accepted Commerce's more generalized methodology, which relied heavily on inferences drawn from circumstantial evidence to connect the various elements of the alleged indirect subsidy program.  AK Steel, 192 F.3d at 1374-75.  However, the Federal Circuit took issue with the substantiality of the evidence proffered by Commerce within that approach.  Id.  Ultimately reversing in part this Court's decision to uphold Commerce's determination, the Federal Circuit held that Commerce had failed to produce sufficient direct or circumstantial evidence to

---

[11] This Court has also found that "evidence of motive and opportunity alone" are insufficient to prove improper government action under a different aspect of the countervailing duty statute.  Al Tech Specialty Steel Corp. v. United States, 28 CIT ___, ___, Slip Op. 04-114 at 19 (Sept. 8, 2004).

support its finding of an indirect subsidy program by

substantial evidence.  Id. at 1376.

     In so holding, the Federal Circuit reinforced the common

sense principle that the quantum and quality of evidence

required to satisfy the substantial evidence standard varies

from case to case.  Accord Astra Pharm. Prod., Inc. v.

Occupational Safety & Health Review Comm., 681 F.2d 69, 74 (1st

Cir. 1982) (noting that "what constitutes substantial evidence

varies with the circumstances").  More or richer evidence may be

required to support, by substantial evidence, allegations of a

complex, large-scale subsidy program encompassing multiple

commercial actors, multiple government authorities, multiple

phases, multiple transactions, multiple months, etc.  Of course,

an affirmative countervailing duty determination supported by

evidence of the depth and breadth implicated by Hynix's

suggested methodology would more easily pass this judicial

review.[12]  But, depending on its quality, scope, and degree of

incrimination, a lesser quantum of evidence (and the inferences

[12] In the Court's view, Hynix's proposed methodology –
implicating every actor and every major decision involved in an
alleged complex subsidy program – would likely require Commerce
to produce evidence more closely approximating overwhelming
evidence.  Such a showing would far exceed the requirements of
the substantial evidence standard in most cases.  See Consolo v.
Fed. Mar. Comm'n, 383 U.S. 607, 620 (1996) (noting that
substantial evidence is "something less than the weight of the
evidence") (citations omitted).

drawn fairly therefrom) may also suffice to connect ostensibly disparate parties and transactions to a single, interrelated program of government entrustment or direction.  When this lesser quantum of evidence is sufficient may sometimes be a difficult determination for the Court to make, but "[t]here are no talismanic words that can avoid the process of judgment." Universal Camera Corp. v. NLRB, 340 U.S. 474, 489 (1951).

Accordingly, the Court declines to burden Commerce with the unnecessarily stringent approach suggested by Hynix and upholds Commerce's reasonable methodology.  See, e.g., Federal-Mogul Corp. v. United States, 18 CIT 785, 807-08, 862 F. Supp. 384, 405 (1994) (noting that "[Commerce] is given discretion in its choice of methodology as long as the chosen methodology is reasonable") (citation omitted); Coal. for the Pres. of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States, 23 CIT 88, 113 n.40, 44 F. Supp. 2d 229, 252 n.40 (1999) ("The [Uruguay Round Agreements Act] and SAA are silent as to how Commerce should make a finding of knowledge of material injury. Therefore, Commerce is afforded reasonable discretion in formulating a methodology.") (citation omitted).

**C.    Commerce's Final Determination Requires Additional Explanation Before the Court May Undertake Substantial Evidence Review**

Even if Commerce's statutory interpretation and methodology are legally permissible, Hynix argues that the facts of this

case do not support Commerce's program theory.  Pls.' Br. at 3.

Hynix contends that Commerce ignored key parts of the record

evidence and seriously distorted others in favor of its program

theory.  Id. at 11-25.  Hynix asserts that, when the

counterevidence is considered and the evidence invoked by

Commerce is viewed properly, Commerce lacked sufficient

evidentiary support for its finding of entrusted or directed

financial contributions, in violation of the substantial

evidence standard.  Id. at 25-29.

The Court understands Hynix's objection to include two

principal arguments: (1) Commerce failed to consider

counterevidence indicating that an independent third party (not

the Korean government) orchestrated Hynix's restructuring, which

was motivated by commercial considerations and (2) the evidence

in support of Commerce's theory was insufficient to establish a

program of entrustment or direction under the substantial

evidence standard.  For the reasons that follow, the Court

remands the Final Determination to Commerce to more fully

address Hynix's first argument and reserves judgment on Hynix's

second argument until after remand.

### 1. Commerce Failed to Adequately Address Counterevidence of Entrustment or Direction, Requiring Remand of the Final Determination for Additional Explanation

Hynix argues that Commerce failed to address

counterevidence indicating that Hynix's restructuring was in

fact organized by independent Citibank/SSB and driven by

commercial considerations.  Pls.' Br. at 11-16.  Hynix argues

that record evidence proves that three of the four major phases

of Hynix's restructuring were actually orchestrated by

Citibank/SSB: (1) Citibank arranged a ten-bank syndicated loan

for Hynix in December 2000; (2) Citibank and SSB designed

Hynix's May 2001 debt restructuring package, modeling it on an

informal Corporate Restructuring Agreement suggested by the

International Monetary Fund and making it conditional on a

successful international equity offering; and (3) SSB

orchestrated Hynix's October 2001 debt restructuring package,

which provided creditors with multiple courses of action

including debt liquidation.  Id. at 11-13.  Since Citibank/SSB

arranged most aspects of Hynix's restructuring and included

market-based contingencies with no guaranteed outcome, Hynix

contends that the ten-month subsidy program simply could not

have existed as alleged.  Id. at 11.  In Hynix's view, Commerce

erred by failing to consider this alternative theory and

supporting evidence in the Final Determination.  Id.

      The Court finds that Commerce erred by failing to

adequately address, in its financial contribution analysis,

counterevidence indicating that Hynix's restructuring was

organized by Citibank/SSB and conditioned on uncertain market

events.  The portion of the Final Determination explaining

Commerce's finding of a program of entrusted or directed financial contributions contains only three footnotes referencing Citibank/SSB's involvement.  Decision Memo at 49 n.12, 57 n.24, 59 n.26.  These somewhat disjointed footnotes do not squarely address Hynix's argument related to Citibank/SSB. Rather, Commerce appears to have viewed this argument as an impermissible request to conflate benefit analysis with financial contribution analysis under the countervailing duty statute.  See id.; Def.'s Br. at 18, 32.  Similarly, Commerce dismissed Hynix's related argument concerning the anomalous presence of commercial contingencies in Hynix's restructuring, generally finding it unsurprising that the private parties in a government-entrusted or directed program would be able to set the commercial terms of their involvement.  Decision Memo at 48, 61; Def.'s Br. at 18, 32.

Commerce misunderstands the true import of Hynix's arguments.  Hynix has essentially advanced an alternative theory of the case – one where an independent commercial actor (not the Korean government) orchestrated the financial contributions under investigation and made at least some of them contingent on uncertain market events (e.g., the international equity offering).  If true, this alternative theory could reasonably explain the concerted actions of Hynix's creditors.  This theory could also perhaps better explain the complexity of Hynix's

restructuring, which featured commercial contingencies and options whose <u>uncertain outcome</u> are indeed very surprising in the context of alleged government control.  Hynix has produced evidence rendering this alternative theory at least colorable. <u>See, e.g.</u>, Pls.' App., App. 1 (Hynix's Questionnaire Response dated Jan. 27, 2003); <u>id.</u>, App. 10 (Hynix Supplemental Questionnaire Response dated Mar. 4, 2003); <u>id.</u>, App. 17 (Citibank Affidavit dated Mar. 20, 2003); <u>id.</u>, App. 7 (Hynix's Verification Report dated May 15, 2003); <u>id.</u>, App. 18 (Citibank Affidavit dated May 22, 2003).

Failure to consider this alternative theory and supporting evidence constituted clear error by Commerce.  <u>See</u> 19 U.S.C. § 1677f(i)(3)(A) (1999) (obligating Commerce to consider relevant arguments made by interested parties).  Commerce may disagree with Hynix's alternative theory and disbelieve the evidence supporting it, but Commerce must explain this decision.  <u>See, e.g.</u>, <u>Allegheny Ludlum Corp. v. United States</u>, 29 CIT ___, ___, 358 F. Supp. 2d 1334, 1344 (2005) (noting that an "agency must explain its rationale . . . such that a court may follow and review its line of analysis, its reasonable assumptions, and other relevant considerations") (citation omitted); <u>Granges Metallverken AB v. United States</u>, 13 CIT 471, 478, 716 F. Supp. 17, 24 (1989) (noting that "it is an abuse of discretion for an agency to fail to consider an issue properly raised by the

record evidence") (citation omitted).  Because Commerce failed

to provide this explanation as part of its financial

contribution analysis,[13] the Court remands this issue to

Commerce.

On remand,[14] Commerce must address Hynix's argument by

thoroughly explaining, if it is able: (1) why Commerce

disregarded or disbelieved the record evidence indicating that

Citibank/SSB – not the Korean government - orchestrated Hynix's

restructuring; and (2) why Hynix's restructuring featured

commercially-based contingencies and options with no guaranteed

---

[13] The Court acknowledges that the Final Determination rightly
included a lengthy discussion of Citibank/SSB as part of
Commerce's benefit analysis.  See Decision Memo at 7-11, 90-92.
However, this discussion fails to meet the Court's requirements.
First, to the extent that this discussion addressed some of the
evidence cited herein, it did so for the limited purpose of
determining whether Citibank's involvement in Hynix's
restructuring was covered by an implicit Korean government
guarantee.  Id. at 8.  At no point in this discussion did
Commerce address Hynix's contention that Citibank organized the
activities of the other investigated financial institutions.
Further, this discussion did not address the uncertain nature of
the commercial contingencies featured in Hynix's restructuring.
Finally, this discussion formed part of Commerce's benefit
analysis, which necessarily assumed the very issue in dispute
(i.e., that the Korean government entrusted or directed the
investigated financial contributions).

[14] With regard to the remand results, the Court admonishes
Commerce to refrain from making oblique references to record
evidence and instead assist the review process by providing
direct citations to documents within the voluminous
administrative record.

outcome if Hynix's restructuring was indeed the product of government entrustment or direction and not market forces.

**2.    The Court Defers Consideration of Hynix's Argument that the _Final Determination_ Lacked Sufficient Evidentiary Support to Establish Entrustment or Direction under the Substantial Evidence Standard**

Finally, Hynix argues that Commerce mischaracterized and exaggerated much of the record evidence supporting its subsidy program theory.  Pls.' Br. at 6.  To explain this position, Hynix's brief provides a lengthy discussion of the specific pieces of evidence allegedly misinterpreted by Commerce.  Id. at 11-25.  In Hynix's view, Commerce's mistreatment of this evidence allowed Commerce to impermissibly "blur a series of separate financial transactions into one single restructuring, even though there were sharp breaks between some transactions and different banks made different decisions at each stage." Id. at 5.  Hynix contends that a "serious analysis of the underlying facts" reveals the evidentiary shortcomings of the Final Determination and, thus, Commerce's failure to satisfy the substantial evidence standard.  Pls.' Reply at 5.

The Court finds that, while Hynix has raised fair questions concerning Commerce's interpretation of the record evidence, these questions are best resolved after receipt of the ordered remand results.  In the Court's view, the Citibank/SSB counterargument is so critical to this case that it "has direct

and material bearing on the proper resolution of the various issues presented" concerning the substantiality of the evidence supporting Commerce's program theory. Usinor v. United States, 26 CIT 767, 784 (2002). Without a reasoned explanation of Citibank/SSB's role in Hynix's restructuring and the alleged financial contributions at issue, "the accuracy and legitimacy of the [agency]'s findings and conclusions [are called] squarely into question." Id. Due to the importance of the Citibank/SSB counterargument, the Court finds itself unable at this time to engage in a substantive review of the evidence supporting Commerce's finding of government entrustment or direction. See Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985) (noting that "if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").

Accordingly, the Court reserves judgment on Hynix's second argument concerning the substantiality of evidence in support of Commerce's finding of entrusted or directed financial contributions until after receipt of the remand results. See, e.g., Luoyang Bearing Corp. v. United States, 28 CIT ___, ___, 347 F. Supp. 2d 1326, 1359 (2004) (declining to address party argument until receipt of remand results on related issue);

Chefline Corp. v. United States, 25 CIT 1129, 1130, 170 F. Supp. 2d 1320, 1324 (2001) (deferring review of portion of agency determination until receipt of remand results on related issue).

## IV.   CONCLUSION

For the foregoing reasons, the Court remands the Final Determination.  Because the Court is remanding to Commerce for further consideration of its threshold finding of potentially countervailable financial contributions, the Court does not yet reach the parties' arguments concerning other aspects of the Final Determination (i.e., Commerce's governmental subsidy function analysis and benefit analysis).  A separate order will be issued accordingly.


                                        /s/ Richard W. Goldberg
                                        Richard W. Goldberg
                                        Senior Judge


Date:      August 26, 2005
           New York, New York